EXHIBIT "B"

1          UNITED STATES DISTRICT COURT
2            SOUTHERN DISTRICT OF OHIO

3                                    **COPY**

4

5     - - - - - - - - - - - - - - x
      MAFCOTE, INC.              :
6                                :
                   Plaintiff,    :
7     vs.                        :   CASE NO.:
                                 :   1:04-CV-853
8     GENATT ASSOCIATES, INC.    :
                                 :
9                   Defendant.   :
      - - - - - - - - - - - - - - x
10

11

12          Deposition of STEPHEN SCHULMAN, taken

13    pursuant to the Federal Rules of Civil Procedure,

14    before Melissa J. Kelly, RMR, CRR, Licensed

15    Shorthand Reporter #00307, and Notary Public within

16    and for the State of Connecticut, held at Mafcote,

17    Inc., 108 Main Street, Norwalk, Connecticut, on

18    September 18, 2006, at 9:36 a.m.

19

20

21

22

23          DEL VECCHIO REPORTING SERVICES, LLC
            PROFESSIONAL SHORTHAND REPORTERS
24                 117 RANDI DRIVE
               MADISON, CT  06443
25          203 245-9583  800 839-6867
      HARTFORD      NEW HAVEN       STAMFORD

1   and are not repeating documents.

2       MR. WALULIK:  We'll go off the record

3   for a second.

4       MR. GREER:  Does that make sense?

5       MR. MINDLIN:  Yeah.  That's fine.

6       (Off the record.)

7       MR. WALULIK:  Before we went off the

8   record, Mr. Greer was talking about a

9   stipulation.  I just want to make sure we've

10  got on the record that everyone agrees to the

11  stipulation he proposed.  I do on behalf of

12  Genatt.

13      MR. MINDLIN:  So agreed.

14      MR. WALULIK:  The third stipulation

15  that we had talked about is a choice of law

16  stipulation.  When Mafcote litigated the

17  underlying insurance coverage case against

18  Continental, they briefed the issues under

19  Ohio law.  We would ask that the tort claims

20  also be governed by Ohio law in this action.

21  And Mr. Greer --

22      MR. GREER:  We'd stipulate to that.

23      MR. WALULIK:  And I think Mr. Mindlin,

24  I'll let you speak.

25      MR. MINDLIN:  Yes.  I had not heard of

this issue until walking into the room within
the last five minutes and I was not -- have
not had a chance to consider it.  So at this
time I'm going to neither accept or refuse
the stipulation.  I'm just going to hold it
in abeyance until I've had a chance to think
about it.

MR. WALULIK:  So we're clear, the
stipulation will be between Genatt Associates
and Mafcote with Continental reserving its
decision on whether to join.

The last stipulation we talked about is
a withdrawal of a couple of counts from the
complaint and, Jamie, I'll let you speak.

MR. GREER:  That's right.  There are
certain counts in the complaint and in
reading the complaint will speak for
themselves.  But they deal with the 2004, the
2005 policy when this complaint was written
and filed, that was a policy that was out
there.  That policy has since expired.  There
have been no claims made under that policy,
so there is no damage stemming from it.  So
we would withdraw our claims in relation to
that policy so that we can focus in on the

1        2001 claim which is the subject matter of the

2        deposition.

3              MR. WALULIK:  And so the matter is

4        clear, you're withdrawing Counts 7 and 8 from

5        the complaint?

6              MR. GREER:  I believe.  Can I just take

7        a look at it quick?  I believe that's

8        correct, David, but I don't want to agree too

9        fast.

10             Yes to both 7 and 8.

11            MR. WALULIK:  Great.  I think we can

12        get started.

13 BY MR. WALULIK:

14   Q.   I'm going to show you a couple of

15 exhibits --

16            MR. MINDLIN:  Before you do, just off

17        the record.

18            (Off the record.)

19            MR. MINDLIN:  Just, I think the

20        reporter said something about waiving the

21        signing and filing of the deposition

22        transcript which is one of the usual federal

23        stipulations at depositions.  The other that

24        I'm familiar with is that all objections

25        except as to form are reserved until trial so

1    A.    Miles is our CFO.  I believe that he dealt

2  with Nick Bozovich when accounting questions came

3  up such as overhead and deductibles, deductions,

4  calculation deductibility.  He could have, but I

5  don't recall him particularly examining the claim.

6    Q.    When you say examine the claim, what types

7  of activities are you talking about?

8    A.    I'm talking about looking at and reviewing

9  the claims that were made to CNA.

10    Q.    Who made the decision to have Royal

11  Consumer Products go out and purchase product on

12  the open market from third parties?

13    A.    I think it was a decision made by Richard

14  Repocki and myself.

15          MR. GREER:  Can I get that name?  I'm

16      sorry.

17          THE WITNESS:  Richard Repocki and

18      myself.

19  BY MR. WALULIK:

20    Q.    And who is Richard Repocki?

21    A.    He's a general manager of Royal Consumer

22  Products.

23    Q.    Does he work out of this office?

24    A.    Yes.

25    Q.    Did he work out of this office in July and

1    August of 2001?

2        A.    Yes.

3        Q.    When was the decision made, if you recall?

4        A.    Sometime around July 16th or July 17th or

5    July 18th.

6        Q.    So if -- this boiler accident happened on

7    July 16th, correct?  So between the 16th and the

8    18th the decision was made for Royal Consumer

9    Products to go out and purchase products on the

10   open market?

11       A.    The decision was made to start probably on

12   July 16th.

13       Q.    Okay.  What is Bob Kaminsky's relationship

14   to this lawsuit?

15       A.    Bob was the plant manager of -- or plant

16   engineer, I forget which, of the Franklin plant of

17   Miami Valley Paper.

18       Q.    What would his job responsibilities have

19   been at that plant?

20       A.    To run the plant.

21       Q.    He was responsible for production?

22       A.    Yes.

23       Q.    When did Mr. Kaminsky cease employment with

24   Mafcote?

25       A.    I'm not sure.

1      A.    Correct.

2      Q.    And you held those positions during 2001?

3      A.    Correct.

4      Q.    You've been president of Mafcote since

5   1988, right?

6      A.    Correct.

7      Q.    And you've been employed by Mafcote since

8   1968?

9      A.    Correct.

10     Q.    What's your educational background?

11     A.    I have a degree from University of

12  Pennsylvania in business administration and a

13  master's degree in business administration from

14  Columbia.

15     Q.    So your undergraduate, is it a bachelor of

16  arts?

17     A.    BA.

18     Q.    And your Columbia degree is an MBA?

19     A.    MBA.  Actually, it's a BS, bachelor of

20  science.  Undergraduate is a BS.

21     Q.    Do you have any particular special

22  education that you studied or was it just a general

23  MBA?

24     A.    MBA was, I think, marketing.  I'm not

25  positive.

1          THE WITNESS:  The other part of the

2      situation is that during the time that the

3      carrier is responsible for the loss, the

4      carrier does the same thing, makes

5      recommendations about the risk and the same

6      process occurs.

7   BY MR. WALULIK:

8      Q.    How many employees does Mafcote have?

9      A.    About 400.

10     Q.    And those 400 employees, do those include

11  employees of affiliates?

12     A.    Uh-huh.

13          MR. GREER:  You need to say "yes"

14      instead of "uh-huh."

15          THE WITNESS:  Yes.

16  BY MR. WALULIK:

17     Q.    Do you have any rough idea as to how many

18  affiliates Mafcote has?

19     A.    We have four major affiliates, and then

20  those affiliates have affiliates.

21     Q.    What are the four major affiliates?

22     A.    FC Meyer, Miami Wabash Paper, Royal

23  Consumer Products, Mafcote International.

24     Q.    What lines of business is Mafcote

25  International responsible for?

1      A.    Mainly consumer products.

2      Q.    What does it do?

3      A.    It operates affiliates.

4      Q.    How many affiliates?

5      A.    When?

6      Q.    Presently -- from July 2001 to the present?

7      A.    July 2001, I don't believe we had any, but

8  I'm not sure.

9      Q.    How about the present?

10     A.    Present we have three affiliates.

11     Q.    What are those three Mafcote International

12  affiliates?

13     A.    Geographics Australia, EE Mafcote SRL and

14  Geographic Europe.

15     Q.    And when you say "Geographic Australia,"

16  that's an entity that operates in Australia?

17     A.    Correct.

18     Q.    Geographic Europe is an entity that

19  operates in Europe?

20     A.    Correct.

21     Q.    The EE Mafcote, where does that entity

22  operate?

23     A.    Romania.

24     Q.    And how many countries does GE -- Mafcote

25  Europe operate in?

1     Q.    What are his responsibilities presently?

2     A.    General manager of Miami Valley.

3     Q.    Since you joined the company in 1964, has

4 Mafcote and the Mafcote affiliates always carried

5 boiler insurance?

6     A.    To my knowledge.

7     Q.    When did you first become familiar with

8 boiler insurance as carried by Mafcote or the

9 Mafcote affiliates?

10     A.    I don't know.  Maybe soon after I joined

11 the company, but I'm not quite sure when.

12     Q.    When did you begin to assume responsibility

13 for seeing that proper insurance was procured?

14     A.    I think shortly after joining.

15     Q.    So you've had involvement with procurement

16 of boiler insurance on behalf of Mafcote and the

17 Mafcote affiliates since the 1960s?

18     A.    Well, if not the '60s the '70s.

19     Q.    And are your policies typically subject to

20 a one- or three-year policy term, roughly?

21     A.    Typically.

22     Q.    So you've had at least 10 to 20 different

23 renewals during the time you've had that

24 responsibility?

25     A.    It could be.

```
 1        Q.    Does that sound right?

 2        A.    It could possibly be.  I haven't counted

 3   them so I can't tell you.

 4        Q.    How many different insurers has Mafcote had

 5   over that time?  Can you give me a rough guess?

 6        A.    I cannot.

 7        Q.    How many insurance brokers have you had

 8   over that time?

 9        A.    Perhaps five.

10        Q.    Who are those brokers?

11        A.    I think that -- the first one I can recall

12   is Cobdin and Associates.

13        Q.    How do you spell that?

14        A.    C-o-b-d-i-n and Associates.  The second one

15   was Sterling & Sterling.  The third was Dan

16   Mozoratto.

17             MR. GREER:  Spell that, too.

18             THE WITNESS:  I could not.  I'm not

19        going to try Dan Mozoratto.

20             Fourth one was Acordia.  The fifth one

21        was Genatt.

22   BY MR. WALULIK:

23        Q.    Have you considered who you're going to use

24   for your boiler coverage for the next year?

25        A.    Well, I -- what does that mean?  Is that
```

1           THE WITNESS:  That's fine.

2           MR. WALULIK:  Okay.  Great.

3    BY MR. WALULIK:

4       Q.    If you can take a look at Count 2, that's a

5    breach of fiduciary duty claim.

6           Do you understand what a fiduciary is?

7       A.    Yes.

8       Q.    What's your understanding of a fiduciary?

9       A.    My understanding is that a fiduciary

10   obligation is an obligation by a party to another

11   party to act on the -- on behalf of the second

12   party in a manner which is forthright and honest to

13   the party that they're acting for.

14      Q.    Did Mafcote retain the right to refuse to

15   enter an insurance contract recommended by Genatt

16   Associates?

17      A.    Yes.

18      Q.    So the final decision as to whether to

19   purchase the policy was Mafcote's?

20      A.    Correct.

21      Q.    Did Genatt have any authority to bind

22   coverage for Mafcote without your consent?

23      A.    No.

24      Q.    Count 4 begins at Paragraph 46.  It's

25   titled "Breach Of Duty of Good Faith and Fair

1    A.    Correct.

2    Q.    And same thing with Count 6 which is a

3    statutory count under Ohio law.  The representation

4    would be that there is coverage under the policy?

5    A.    Correct.

6              MR. WALULIK:  I think now is a good

7         time to take a break for lunch if you want

8         to.

9              (Whereupon a lunch recess was taken.)

10             MR. WALULIK:  If you can go ahead and

11        mark this 12.

12             (Joint Exhibit No. 12:  Marked for

13        identification.)

14   BY MR. WALULIK:

15   Q.    Mr. Schulman, the reporter has just handed

16   you what has been marked Exhibit 12.  This is a

17   Contingent Business Interruption insurance form

18   from CNA?

19   A.    Yes.

20   Q.    You testified previously that the

21   negligence and other claims that you assert against

22   Genatt are based in part upon the failure to obtain

23   a contingent business interruption coverage.

24             Is this the form that Mafcote contends

25   should have been obtained?

1          MR. MINDLIN:   By "you" do you mean

2     Mr. Schulman?

3          MR. WALULIK:   Correct.

4          THE WITNESS:   No.

5     BY MR. WALULIK:

6     Q.    When was the first notice you received?

7     A.    Well, I received notice on 7/16 or

8     thereabout that they couldn't run the steam foil

9     and from that point through 8/13/01, I had received

10    a stream of other reports.  In order for me to give

11    you a more accurate answer, I'd have to review all

12    of the letters and files to tell you exactly when I

13    understood what.

14    Q.    Continuing with the fax from Bob Kaminsky

15    to yourself, number 1 says that the boiler ruptured

16    on 7/26/01.

17         That date is in fact incorrect?

18    A.    Correct.  That date is incorrect.

19    Q.    The 7/26/01 date, does that refresh your

20    memory as to when the problem was diagnosed?

21    A.    Well, the problem might have been -- it

22    doesn't really.  All I know is that on

23    7/16/06 -- '01, I should say, I knew that the steam

24    foil was inoperative.  And at some point between

25    then and whatever the correspondence indicates they

DEL VECCHIO REPORTING SERVICES, LLC

traced the failure to the boiler and then
ultimately to a boiler rupture but I cannot tell
you when exactly what was known when at this
moment.

Q.   Genatt Associates reported the claim to
Continental on August 14, 2001, correct?

A.   I don't know.  You'd have to show me data
that --

MR. GREER:  That was the last
correspondence you showed him that relates to
that.

BY MR. WALULIK:

Q.   The August 14, 2001 letter from Ed DiGioia
to yourself states that you are suffering business
interruptions, could default on about a million
dollars in sales.

To whom were you in danger of defaulting?

A.   Well, we had numerous customers who
required delivery on time and to those customers we
would default.

Q.   This fax was sent, it appears, on August
14th at 11:42 a.m.; is that correct?

A.   Yes.

Q.   Is this the first written notice that
Mafcote provided to Genatt Associates about this

1    product already?

2        A.    Yes.    There may have been purchases after

3    that date but certainly before that date.

4        Q.    And were the purchases after that date

5    confirmed by CNA?

6        A.    No.

7              MR. WALULIK:    Let's mark these 19.

8              (Joint Exhibit No. 19:    Marked for

9         identification.)

10   BY MR. WALULIK:

11       Q.    Going back to Exhibit 18 if we could for

12   just one second, is it Genatt's contention or,

13   excuse me, is it Mafcote's contention that Genatt

14   breached any duty in failing to inform you about

15   purchases of stock, replacement product?

16       A.    Our position is that they helped us prepare

17   the claim.    The claim was denied by CNA.    If

18   there's any responsibility for the preparation of

19   the claim and its failure to have CNA respond

20   properly, it lies with Genatt.

21       Q.    Okay.    And I understand your previous

22   response.    My question is just a little different.

23   I'm just trying to determine who made the decision.

24             Genatt never told you to go out and

25   purchase third party product, correct?

1     Q.   From August 13th to August 15th the only

2  customer of the Franklin affiliate that cancelled

3  an order was Royal Consumer Products, correct?

4     A.   Correct.

5     Q.   If you take a look at the first page of

6  this exhibit, the August 29th letter from yourself,

7  the second paragraph states that, "On July 27,

8  2001, Mr. Kaminsky contacted Hartford Steam."

9       Does that refresh your recollection as to

10  the dates that Mr. Kaminsky reported the claim to

11  Hartford Steam?

12     A.   Yes.

13     Q.   And your understanding is that that date is

14  correct?

15     A.   Correct.

16     Q.   Initially did you or Mafcote believe that

17  Continental bore some negligence on its own part

18  for failing to inspect this boiler?

19     A.   Correct.

20     Q.   Is it your belief that had Continental

21  inspected this boiler since Hartford Steam last

22  inspected it, that this claim would have been

23  reported correctly?

24     A.   Yes.  I believe that we would have reported

25  it to the right carrier.

1     A.   I'm sure.  I have to find out what we were

2    doing during this time period to remedy the problem

3    of the lack of steam foil and I, just in the normal

4    course of business, it would have been reported

5    that they are -- that Franklin is trying to see how

6    to repair the boiler and that one of the options is

7    to replace it.

8     Q.   Are there daily communications from the

9    home office in Connecticut with the field affiliate

10   in Ohio?

11    A.   Yes.

12    Q.   So is it fair to say that certainly the

13   people here in the home office in Norwalk knew that

14   the boiler wasn't functioning as of August 9th when

15   this estimate was obtained?

16    A.   Yes.

17    Q.   Now, you had some testimony in response to

18   questions of Mr. Walulik where you acknowledged at

19   some point in time the folks at the Franklin

20   facility ordered a rental boiler.

21    A.   Right.

22    Q.   Do you know when the order was placed for

23   the rental boiler?

24    A.   Not offhand.

25    Q.   Is that information you can obtain?

A.    It would be in the records which I -- which
is in here in terms of the ordering date.  But I
recall that it was within 24 hours or 48 hours or
something like that.  It wasn't a long period of
time.

Q.    Twenty-four hours or 48 hours of what
event?

A.    Of authorization by CNA to obtain a rental
boiler.

Q.    Is it your testimony that it was not until
CNA gave authorization to obtain a rental boiler
that Mafcote or the Ohio affiliate ordered that
boiler?

A.    Correct.

Q.    If the information shows that the boiler
was ordered prior to CNA even being notified, how
would you explain that?

A.    I couldn't but, you know, it's possible.
I'm not saying that it didn't happen.

Q.    Do you know the length of time between
ordering the boiler and the receiving the boiler,
the rental boiler?

A.    I don't know.  Perhaps three days or four
days.

MR. GREER:  If you don't know, don't

1       MR. WALULIK:  I'm sorry.  Can you read

2       back the last two questions just so I'm clear

3       on what was answered.

4           (Whereupon the record was read by the

5       Court Reporter.)

6   BY MR. MINDLIN:

7       Q.    At any time in connection with those

8   discussions with the representatives of Genatt that

9   you mentioned, did any of them suggest to you that

10  the purchases should be made by the Franklin, Ohio

11  facility and not by Royal?

12      A.    No.

13      Q.    Did that topic come up one way or the

14  other?

15      A.    That topic did not come up.

16      Q.    To your knowledge did anyone at Mafcote in

17  any conversations with CNA representatives ever

18  indicate that Mafcote did not intend to submit a

19  loss of income claim, only an extra expense claim

20  with respect to this incident?

21      A.    I'm afraid that although I've submitted

22  claims before, I really am not an expert in filing

23  claims.  We know what a loss is.  We told them how

24  we were going to file a loss and what our losses

25  were.  I had no objection.  We had no objection at