EXHIBIT "E"

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF OHIO
 2  - - - - - - - - - - - - - - -x
    MAFCOTE INCORPORATED,
 3
                    Plaintiff,
 4
        -against-
 5
    GENATT ASSOCIATES, INC., Defendant and
 6  Third-Party Plaintiff,

 7      -against-

 8  CONTINENTAL CASUALTY INSURANCE COMPANY,

 9                  Third-Party Defendant.
    - - - - - - - - - - - - - - -x
10
                140 Broadway
11              New York, New York

12              September 19, 2006
                9:23 a.m.
13

14       DEPOSITION of CONTINENTAL CASUALTY

15  INSURANCE COMPANY, the Third-Party Defendant in

16  the above-entitled action, by NICK BOZOVICH,

17  held at the above time and place, pursuant to

18  Notice, taken before Sandra Camerada, a

19  shorthand reporter and Notary Public within and

20  for the State of New York.

21

22

23

24

25
```

Condensed Copy

Bozovich 62

2 have a present memory -- I don't want to say
3 something that is not -- if you have something
4 that indicates different, but I believe it's
5 something other than the Franklin location.
6  Q  If both the Franklin location and
7 the Louisville location were required to be
8 considered for a deductible, would that
9 increase the deductible, make it a higher
10 number?
11  A  Yes.
12  Q  Let me hand you what's been marked
13 as Exhibit 30 previously. This is a March 15,
14 2002 report from yourself to Lon Barrick. Do
15 you recall drafting this claim report?
16  A  Yes.
17  Q  I direct your attention to page 3
18 and in particular the paragraph directly below
19 the daily value deductible. In that paragraph,
20 you state "since a loss occurred at both
21 locations, we recommend that the total of the
22 ADV for both locations should be used to
23 calculate the deductible for any extra expense
24 claim remaining." ADV stands for average daily
25 value, correct?

Bozovich 63

2  A  Correct.
3  Q  Is it accurate that you recommend
4 the both Louisville and Franklin Ohio locations
5 should be averaged together to calculate the
6 deductible?
7  A  No. I don't think that's what I
8 was recommending.
9  Q  Does it state "we recommend that
10 the total of the ADV for both locations should
11 be used"?
12  A  Yes, but the way you stated it, you
13 were talking about averaging both and I don't
14 think that was not my intention here. If it
15 was something that you would cover, you would
16 have to look at the average daily value for
17 each location. You don't average them
18 together. They would have to be looked at
19 individually and applied individually.
20  Q  So it was your position, at this
21 point, that a loss occurred at both locations?
22  A  No.
23  Q  Then how am I misunderstanding your
24 sentence "since a loss occurred at both
25 locations"?

Bozovich 64

2  A  You are focusing on one paragraph
3 that's three paragraphs of a section regarding
4 coverage discussion, coverage questions, and I
5 was trying to report that there's a question of
6 coverage and what's covered and I was putting
7 out options essentially or giving different
8 scenarios I guess is the best way to put it.
9  Q  And your ultimate recommendation
10 was that the total of the ADV for both
11 locations should be used?
12  A  No. I don't believe that was my
13 recommendation.
14  Q  Does this letter not state "we
15 recommend that the total of the ADV for both
16 locations should be used"?
17  A  If there's coverage for it, that
18 would be the way it would be done, yes, but
19 you're focusing on one paragraph and ignoring
20 the paragraphs that go before it.
21  Q  I think at this point the letter
22 can speak for itself.
23  A  If there is an extra expense loss,
24 it specifically says "and claim at the Royal
25 location, it would appear that the daily value

Bozovich 65

2 of both locations should form the basis for the
3 two times average daily value deductible." The
4 sentence starts out with "if," so yes, it
5 should speak for itself.
6  Q  I hand you what has been previously
7 marked as Exhibit 47. This is an April 5, 2002
8 letter from yourself, Nick Bozovich to Steven
9 Schulman. Do you recall sending this letter?
10  A  Yes.
11  Q  Is this the letter where
12 Continental denied the claim for replacement
13 product?
14  A  Let me just review it.
15  Q  Take your time.
16  A  Yes, it is.
17  Q  This letter makes no reference to
18 any coverage argument or coverage basis that
19 physical damage had not occurred at Louisville,
20 correct?
21  A  Correct.
22  Q  Had you, in fact, by April 5, 2002
23 informed Mafcote that there would be no
24 coverage if there were no physical coverage at
25 Louisville?

Bozovich 66

2 A Can you repeat that?
3 Q By April 5, 2002 when you made the claim denial, had you informed Mafcote that there would be no coverage under the policy if there were no physical damage at the Louisville facility?
8 A No, I don't believe I did.
9 Q That basis for denying coverage was raised for the first time at trial?
11 MR. MINDLIN: Objection to the form of the question.
13 A I don't know when it was raised for the first time.
15 Q Do you recall winning an insurance coverage lawsuit?
17 A Yes, twice.
18 Q Twice?
19 A Well, in the District Court and the Court of Appeals.
21 Q In any event, do you recall the basis for why Continental won that case?
23 A Yes.
24 Q And that basis --
25 A In part was that there was no

Bozovich 67

2 damage at the Royal location.
3 Q And the Royal location being in Louisville?
5 A Correct.
6 Q Do you recall prior to that suit being commenced whether that basis for denying coverage had been raised? It wasn't raised by April 2, 2002, correct?
10 A That's correct. I just don't recall when that was first raised. It was raised at some point, I just don't remember when.
14 MR. WALULIK: Let's take a break. I'm going to go over my notes. Your counsel or Mr. Greer may have questions for you as well.
19 (Whereupon, a recess was taken at this time.)
21 Q Just a couple of quick follow-up questions, Mr. Bozovich.
23 A Sure.
24 Q After August 15, 2001, did anyone at Mafcote or on Mafcote's behalf confirm with

Bozovich 68

2 you that third party purchases could be made, replacement product purchases?
4 A You're asking me to confirm that they could be made?
6 Q Yes.
7 MR. MINDLIN: Note my objection to the form of the question. You could answer.
10 A I think that was the whole substance of our disagreement was third party purchases and whether they were covered or not almost from the beginning of the adjustment.
14 Q Prior to those purchases being made, no one at Mafcote or on Mafcote's behalf informed on Continental that they were go to be made?
18 A Well, we didn't have notice of the loss until the 14th and most of them were prior to the 14th.
21 Q For instance, the purchases that were made on the August 21st --
23 A They were billed on August 21st, the invoice dated August 21st. I don't know when they were actually ordered or purchased.

Bozovich 69

2 Q I'm just trying to understand, Continental did not have notice prior to those purchases being made that they were going to be made by Mafcote?
6 A I don't remember that.
7 Q Did anyone at Mafcote or on Mafcote's behalf ever tell you that they didn't have a copy of their insurance policy?
10 A I don't remember that at all.
11 MR. WALULIK: Let's have this marked as Exhibit 57.
13 (Plaintiff's Submission of Expert Report of Joseph R. Blumberg was marked as Joint Exhibit 57, for identification, as of this date.)
18 Q This is an expert report by an individual named Joseph R. Blumberg that has been filed by Mafcote in this case on Mafcote's behalf.
22 Have you had an opportunity at all to review this report prior to your deposition today?
25 A No.

18 (Pages 66 to 69)

|  |  |
|---|---|
| 1  Bozovich  70<br>2   Q   I'm simply interested in<br>3 Mr. Blumberg's expert opinions. Take a look at<br>4 page 3 of 5, if you could, simply read the<br>5 first paragraph. Let me know when you are<br>6 finished. I'm going to ask you a couple of<br>7 questions about Mr. Blumberg's opinions, your<br>8 own views on those?<br>9   A   Okay.<br>10  Q   If we can for a second not consider<br>11 the issue as to the timing of this loss August<br>12 13th versus product that was cancelled prior or<br>13 anything like that --<br>14  A   You mean the timing of the report?<br>15  Q   Correct.<br>16  A   Okay.<br>17  Q   If the Franklin Ohio affiliate had<br>18 been the one to purchase replacement product,<br>19 would that have resolved the damage to the<br>20 location issue that was litigated in the first<br>21 insurance coverage case in your opinion?<br>22      MR. MINDLIN: I'm going to<br>23      object to the question. I direct<br>24      him not to answer. He's here as<br>25      a fact witness, not to give | 1  Bozovich  72<br>2      MR. MINDLIN: Yes, that<br>3      particular question, yes. If you<br>4      ask another question, we'll take<br>5      another shot it at.<br>6   Q   The first sentence of that<br>7 paragraph read "if Miami had submitted the<br>8 extra expense claim and had gone into the<br>9 market to supply paper at the extra cost and<br>10 had suffered the loss, CNA would have had to<br>11 pay the claim." Do you agree with that<br>12 statement?<br>13      MR. MINDLIN: I object to<br>14      the form. You could give your<br>15      understanding.<br>16  A   It doesn't qualify when the<br>17 purchases would have been made in relation to<br>18 when the loss was reported, so I wouldn't<br>19 necessarily agree with it, but if you want to<br>20 qualify that further.<br>21  Q   If we qualify it to eliminate the<br>22 timing issue, is that a correct statement?<br>23      MR. MINDLIN: Again, I<br>24      object to the form. You can give<br>25      your understanding. |
| 1  Bozovich  71<br>2 opinions.<br>3      MR. WALULIK: He's here as a<br>4      fact witness who handled the<br>5      claim. He's testified that it is<br>6      his job responsibility to take<br>7      facts and apply them to coverage.<br>8      I'm just simply asking him if<br>9      that fact were present, would it<br>10     resolve the coverage? I think<br>11     he's qualified to answer that.<br>12     MR. MINDLIN: He may be<br>13     qualified as an expert to answer<br>14     it, but he's not here to answer<br>15     expert questions or give<br>16     opinions. He's here to tell you<br>17     the facts as to what he did as<br>18     his job on behalf of CNA and he's<br>19     done that. If you ask a proper<br>20     question, he could give an<br>21     answer. That's an opinion<br>22     question and it's not<br>23     appropriate.<br>24     MR. WALULIK: Are you<br>25     instructing him not to answer? | 1  Bozovich  73<br>2   A   If there was no issue of<br>3 commencement of liability that there was in<br>4 this claim, yes, I would agree with that.<br>5   Q   I'm just going to ask you couple<br>6 quick questions about the second paragraph.<br>7       Are you familiar with a type of<br>8 insurance coverage called contingent business<br>9 interruption and extra expense insurance?<br>10  A   Yes.<br>11  Q   I'm going to show you what's<br>12 previously been marked as Exhibit 12. Take a<br>13 look at that. Are you familiar with that<br>14 coverage form?<br>15     MR. WALULIK: Just so the<br>16     record is clear, this is a<br>17     contingent business interruption<br>18     coverage form that is a CNA form.<br>19  A   Yes.<br>20  Q   Is it Continental's position that<br>21 upon payment of a contingent business<br>22 interruption loss, Continental is subrogated to<br>23 the rights of the policyholder?<br>24     MR. MINDLIN: Objection to<br>25     the form. Give your |