EXHIBIT 4

1

```
1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6               FOR THE SOUTHERN DISTRICT OF OHIO

7                          - - -

8    MAFCOTE, INC.,                    :
                                       :
9                 Plaintiff,           :
                                       :
10        vs.                          :  CASE NO.  1:04-CV-853
                                       :
11   GENATT ASSOCIATES, INC.,          :
                                       :
12                Defendant.           :
                            - - -
13

14

15                        DEPOSITION

16   of TERRENCE A. REIFF, taken before me, Lori Jay, a

17   Registered Professional Reporter and Notary Public in and

18   for the State of Ohio at large, pursuant to notice and

19   agreement of counsel, as on Cross Examination, at the law

20   offices of Bieser, Greer & Landis, 400 National City

21   Center, in the City of Dayton, County of Montgomery, and

22   State of Ohio, on Tuesday, the 31st day of October, 2006,

23   beginning at 9:01 A.M.

24                          - - -

25
```

```
1    time, in risk management since that time, correct?
2         A.    That's correct.
3         Q.    You were involved part time starting a couple of
4    years after your retirement in 2002 through, what, the
5    summer of this year, 2006?
6         A.    That's correct.
7         Q.    You've told me that you're not a broker or you
8    don't have the expertise as a broker, correct?
9         A.    That's correct.
10        Q.    Do you have expertise in coverage issues?
11        A.    Yes.  I believe I do.
12        Q.    Do you have expertise in putting together
13   insurance claims?
14        A.    Yes.
15        Q.    Is it your understanding that a broker
16   represents an insured?
17        A.    That's -- yes.
18        Q.    Doesn't represent the insurance company?
19        A.    That's correct.
20        Q.    Is it your understanding that a broker's duty is
21   to act in the best interests of the insured?
22        A.    Yes.
23        Q.    Have you -- were you involved in boiler and
24   machinery losses when you were with the Mead Corporation?
25        A.    Yes, sir.
```

1    that analysis to the operations of the company.

2        Q.    What services would you look for from that

3    independent consultant?

4        A.    Risk analysis; that is looking at flow charts

5    and other information about how Mafcote conducted its

6    operations, and then using that information relating it to

7    the coverage offered, and then making recommendations

8    about any changes that the consultant felt were to be

9    appropriate.

10       Q.    Aren't all of those things something that

11   Mafcote could expect from their broker, Genatt?

12           MR. WALULIK:  Objection.  Lacks foundation.

13           You can answer.

14           THE WITNESS:  I suppose in an informal way they

15   could.  I'm not aware of any formal arrangement either by

16   handshake or in writing as to what services Mafcote should

17   have expected from its broker.

18   BY MR. GREER:

19       Q.    Do you have an understanding that Genatt had

20   individuals who were experts in coverage issues?

21       A.    I don't have that understanding.  It would be

22   expectation, however.

23       Q.    Okay.  And so as far as coverage issues are

24   concerned, it would be reasonable for Mafcote to depend

25   and rely on experts within Genatt in that area, correct?

1     A.   Yes.

2     Q.   And is it your understanding that

3  recommendations in relation to boiler and machinery losses

4  were made by Genatt to Mafcote?

5     A.   I'm aware of one, and I'm not sure if this was

6  just a statement by Mr. Blumberg or something Genatt said,

7  and that had to do with the purchase of contingent

8  business interruption insurance.  I know Mr. Blumberg's

9  report made reference to that.

10        Now, whether Genatt actually did that, whether

11  it was considered, and as I said in my report, that would

12  seem to be redundant because they've already been assured

13  the coverage was okay.

14     Q.   Is it your understanding that all

15  recommendations made by Genatt to Mafcote in relation to

16  boiler and machinery coverage were accepted?

17     A.   I don't know what recommendations they made so I

18  can't comment.

19     Q.   Dealing with recommendations and coverage issues

20  would -- would follow these three things that you've

21  talked about for an independent consultant: risk analysis,

22  coverage offered, and recommendations, correct?

23     A.   Yeah.  Yes.

24     Q.   So getting another party to look at these issues

25  would be repeating the work that Genatt was already

1   performing, correct?

2           MR. WALULIK:  Objection.  Mischaracterizes his

3   previous testimony.  Lacks foundation.

4           You can answer if you know.

5           THE WITNESS:  I don't know that it would

6   duplicate or not because I didn't or I wasn't provided

7   with any information as to what Genatt said or did.

8   BY MR. GREER:

9       Q.   Are there any other areas in your opinion that

10  this independent consultant would give service to Mafcote

11  than what you've referenced in your report?

12      A.   An independent consultant could at the time of

13  the claim provide advice as to how certain things were

14  done or should have been done to bring the best benefit to

15  Mafcote.

16      Q.   Again, are you aware whether Genatt had people

17  who were experts putting claims together?

18      A.   I'm not specifically aware of that.

19      Q.   Have you seen any correspondence with a

20  gentleman by the name of Ed Digioia?  That's

21  D-I-G-I-O-I-A.

22      A.   Yes.

23      Q.   And do you know what Mr. Digioia's expertise is?

24      A.   I'd have to relook at his letter, and I don't

25  have that with me, so I don't recall.  I believe he's with

1  CNA claims, but I may be wrong there.

2      Q.   There would have been a gentleman with Genatt.

3      A.   Oh, okay.

4      Q.   There's a Nick Bosevich who you may be thinking

5  of.

6      A.   Oh, okay.

7      Q.   The names get confused.

8      A.   The adjuster.  Okay.  Uh-huh.

9      Q.   In relation to this opinion and in relation to

10  the claim submission, what advice do you believe an

11  independent consultant or additional policy analysis would

12  provide that would have changed the situation we have here

13  in any way?  How would it cause it to be different?

14      A.   Who would have made the purchase of the

15  replacement material seems to be the key here.  Based upon

16  the policy and the way it was written somebody should have

17  known that by Royal, the other Mafcote subsidiary, making

18  the purchase that that eliminated some protection that

19  Mafcote wanted, and I think a consultant, it wouldn't

20  necessarily have to be an insurance or risk management

21  consultant, it could be just a general business consultant

22  who understood insurance coverages, could have figured

23  that out.

24      Q.   Is it your opinion that if the claim was written

25  as Miami Valley or Miami Valley Wabash, the plant in

1   Franklin, --

2       A.   Yes.

3       Q.   -- suffering the loss rather than Royal Consumer

4   Products suffering the loss that that would have made a

5   difference in this case?

6       A.   Yes.  That's how I feel.

7       Q.   And are you aware that the advice given from

8   Genatt was that it didn't make a difference in this case?

9           MR. WALULIK:  Objection.  Lacks foundation.

10  Mischaracterizes prior depositions.

11          But go ahead.  You can answer if you know.

12          Would you read back the question?

13          (The indicated question was read back.)

14          THE WITNESS:  I'm not aware of that.  If I

15  could --

16  BY MR. GREER:

17      Q.   If that was the advice would you say that advice

18  was incorrect?

19      A.   If their -- if their advice was it wouldn't have

20  made a difference?  Is that what you're saying?

21      Q.   Yes.  Yes.

22      A.   I wouldn't agree with what they said.

23      Q.   And it's your opinion that if the claim was

24  written so that the loss flowed through Miami Valley

25  Paper --

```
1        A.    Uh-huh.
2        Q.    -- that there would have been coverage in this
3   case?
4        A.    For the business interruption aspect of this
5   loss?
6        Q.    Yes.
7        A.    That's how I feel.
8        Q.    Let me have you go to exhibit 12 in this stack
9   of papers you have in front of you here.
10       A.    I have it.
11       Q.    Okay.  Have you seen -- this is just a form
12  endorsement from CNA for contingent business interruption;
13  is that right?
14       A.    I would have to read it thoroughly, but it says
15  that in the heading.
16       Q.    Have you seen this before?
17       A.    I don't recall seeing it, but it may have been
18  in the material you provided and it just -- there was a
19  lot of it.
20       Q.    This is the subject of the second bullet point
21  in at least the large paragraphs of your opinion on the
22  second page under Coverage, correct?
23       A.    Yes.
24       Q.    And your opinion here is that there would be no
25  reason to get this type of an endorsement because there
```

```
1    was already coverage in place on the policy itself?

2         A.   No.  I didn't say that.  I said they were

3    assured that coverage was in place.

4         Q.   Okay.

5         A.   That was my understanding, that Mafcote was

6    assured that coverage was in place.

7         Q.   Okay.  Is it your opinion that coverage was in

8    place?

9         A.   No.  I do not believe it was in place.

10        Q.   So Genatt told them that the coverage was in

11   place, and in fact it was not, correct?

12        A.   Based on the material provided to me, that's my

13   interpretation.

14        Q.   Okay.  Is it your understanding that, if you

15   have one, that Mafcote relied on Genatt's representations

16   that coverage was in place?

17        A.   That's my impression, that they relied on their

18   statements.

19        Q.   And if this contingent business interruption

20   endorsement was added is it your opinion that that would

21   have provided enough coverage, or do you know?

22        A.   A contingent --

23             MR. WALULIK:  You can take a look at your

24   opinion if you need to know what he's referring to in your

25   report.
```

1        THE WITNESS:  A contingent business interruption

2    endorsement, as I recall, may have a limit of liability on

3    behalf of the insurance company.  This doesn't say that.

4    I couldn't say for sure that there would be enough

5    coverage.  It might be broad enough, but was it high

6    enough?

7    BY MR. GREER:

8        Q.   Your opinion that there was not coverage in

9    place for this loss, is that opinion the same whether or

10   not the claim is written as Miami Valley suffering the

11   loss or Royal Consumer Products?

12       A.   If Miami Valley had suffered the entire loss, if

13   they had purchased the additional material on the open

14   market and then supplied it to Royal at the agreed-upon

15   price, then I believe coverage would be in place, but with

16   Royal buying its own substitute product on the open market

17   at some inflated price it's clear to me based on the

18   material I was provided that there's no coverage.

19       Q.   What if Royal went ahead and purchased, as what

20   happened in this case, but the claim was made under Miami

21   Valley due to Miami Valley's liability to Royal Consumer?

22       A.   I suppose there might be a little claims fraud

23   involved then.

24       Q.   So in your opinion that would not fly?

25       A.   No.  It would not be the proper way to do it.  I

1  don't know whether it would fly or not but it wouldn't be
2  the proper way to do it.

3      Q.   It's your opinion further to be coverage in this
4  case it would have had to have been Mafcote that made the
5  purchases to the outside third party vendors -- I'm sorry,
6  not Mafcote -- Miami Valley to make the purchases?

7      A.   My opinion is Miami Valley should have made the
8  purchases at whatever inflated price they had to pay, thus
9  responding to their contractual requirements, and then
10  they would have the claim.

11     Q.   Could the policy have been written in a way to
12  provide coverage with Royal Consumer Products purchasing
13  the product from the third party vendors?

14     A.   Theoretically it could have been done.  Would
15  the insurance company have agreed to some changes that
16  would have expanded the coverage?  I don't know.

17     Q.   Tell me how it would have been written
18  differently for that coverage to be in place.

19     A.   The thought that came to my mind is that the
20  named insured wording should have had some reference to
21  collectively and not separately.  Or -- yeah.

22          Or maybe there's a better way to say that, but
23  if there would have been some collective wording in there
24  theoretically that might have led to coverage for the
25  business interruption.

1    Q.    What if the named insured was Mafcote and its

2    subsidiaries; would that have done the trick?

3        A.    I think you'd still need the collective wording

4    in my opinion.

5        Q.    And tell me what you mean by the collective

6    wording then.

7        A.    Well, right now it's written as though it's

8    Mafcote and then each of the subsidiary's names are

9    delineated out so they're all independent of each other.

10   However, by putting in some wording that says we're going

11   to collectively cover all of you, and a loss at one is

12   considered a loss for all, then we may have had some

13   coverage, but that assumes that the underwriter at CNA

14   would accept that, and if he did would Mafcote have

15   accepted any change in premium, because maybe the

16   underwriter would want additional money because he would

17   recognize an inflated risk to him.

18       Q.    In your experience is that something that you

19   have seen, that collective type of wording?

20       A.    No.    When I was at Mead our approach was more of

21   a -- of a contingent business interruption approach where

22   we had product from a mill going to a converting facility.

23   We approached it from that way, not specifically with an

24   endorsement but we had wording in our policies that

25   covered us for that.    We had a number of claims both

1    boiler machinery and just property losses that we

2    perfected.

3        Q.    And then going back to this endorsement for

4    contingent business interruption.

5        A.    Are you talking about exhibit 12?

6        Q.    Yes.  It's your opinion that that would not have

7    made any difference in this case?

8        A.    My opinion is if this endorsement was a part of

9    the policy, Mafcote and its subsidiaries, it would have

10   provided the coverage.

11       Q.    It would have?

12       A.    Yes.  In my opinion.

13       Q.    In the last sentence of the next paragraph, the

14   Named Insured Clauses paragraph, and this is going back to

15   exhibit 76, you write, any differences in Named Insured

16   wording between the policies would have had no impact on

17   coverage or claim payment.

18       A.    What line is that?

19       Q.    The last sentence.

20       A.    Oh, any differences in the Named Insured.  Okay.

21       Q.    And I take it that's different than what you've

22   just told me about this collectively and individually?

23       A.    Right.  Yes.  There was no material difference

24   between -- so far as how this case is concerned, there's

25   no material difference there.  You'd still need in either

1    A.    Paid this claim.  That's correct.  That's how I

2  feel.

3    Q.    They would not have?

4    A.    No.  In my opinion.

5    Q.    And then under 7 it says Mafcote relied upon its

6  broker to recommend the proper and necessary insurance

7  coverages that are required in order to properly protect

8  its interests and assets.

9         Now, do you agree or disagree, or do you have no

10 opinion with that?

11   A.    I don't totally agree with it because documents

12 I was provided indicated that Mr. Schulman, the president

13 of Mafcote, felt that he had some knowledge in this area.

14 So you can't -- I can't say there was total reliance by

15 Mafcote.

16   Q.    Can't say there was total reliance, but some

17 reliance; is that what you're telling me?

18   A.    Some reliance.  There was some reliance but not

19 total.

20   Q.    And what do you base that on?

21   A.    Well, the relationship automatically suggests

22 reliance.  The relationship between Mafcote and Genatt

23 automatically suggests reliance.

24   Q.    And you agree with Mr. Blumberg that the correct

25 way to submit this claim would have been Miami to have

1          - - -

2          CROSS EXAMINATION

3    BY MR. MINDLIN:

4          Q.    Good morning, Mr. Reiff.

5          A.    Good morning.

6          Q.    In connection with answering Mr. Greer's

7    questions dealing with the exhibit 12 Contingent Business

8    Interruption Form, you said that in your opinion that form

9    would have provided coverage; is that correct?

10         A.    That's what I said.

11         Q.    And I just need to clarify.  When you say would

12   have provided coverage, coverage of the claim as it was

13   presented, meaning with Royal having purchased the

14   substitute product?

15         A.    Yes.  Subject to my qualifier I don't know what

16   limit of coverage they would have purchased, and the limit

17   may have been inadequate to cover their two hundred and

18   some thousand dollar loss.

19         Q.    But if there was enough limit of liability and

20   if this form were in place the claim as it was presented

21   in your opinion should have been paid by the insurance

22   company?

23         A.    Yes.

24              MR. MINDLIN:  I have no other questions.  Thank

25   you.

```
1    STATE OF OHIO          :
                            : ss    C E R T I F I C A T E
2    COUNTY OF MONTGOMERY   :

3

4          I, LORI JAY, a Registered Professional Reporter

5    and Notary Public in and for the State of Ohio at large,

6    duly commissioned and qualified;

7          DO HEREBY CERTIFY that the above named TERRENCE

8    A. REIFF, was by me first sworn to testify to the truth,

9    the whole truth, and nothing but the truth; that his

10   testimony was recorded by me in Stenotype and thereafter

11   reduced to typewriting; that the signature of the witness

12   to the deposition was not waived, and was taken at the

13   time and place hereinabove set forth, by notice and

14   agreement of counsel as stated.

15         I FURTHER CERTIFY that I am not a relative or

16   attorney of either party, nor in any manner interested in

17   the event of this action.

18         IN WITNESS WHEREOF I have hereunto set my hand

19   and affixed my seal of office on the 6th day of November,

20   2006.

21

22                           _____
                             LORI JAY, RPR, CMRS
23                           NOTARY PUBLIC, STATE OF OHIO
                             My Commission Expires 11-25-11
24                                  - - -

25
```

Charlene Nicholas & Associates, LLC
5136 Phillipsburg-Union Road, Englewood OH  45322
Phone:  (937) 836-7878    Fax:   (937) 836-1718